HEARD NOVEMBER TERM, 1878.

CASE No. 714.

THE STATE, EX REL. THOMAS P. BRANCH, v. S. L. LEAPHART, STATE TREASURER.

Under an act passed in 1873 to reduce the volume of the public debt, the state was pledged to make an annual levy of two mills, the money so raised to be kept in the treasury, and applied only to payment of interest on the bonds and stocks issued under the authority of that act, the surplus to be used as a fund for the redemption of the principal. In 1877, and in March, 1878, the legislature failed to make such specific levy, but levied in their supply acts of those dates a tax to be applied *inter alia* to interest on such securities issued under the authority of the act of 1873, as should be declared valid under certain proceedings then respectively pending, to inquire into and determine their validity. After the investigation ordered in act of 1877 had been completed, but pending the further proceedings directed by the act of March, 1878, the legislature, in their supply act of December, 1878, made an appropriation of the money then in the state treasury, realized under the levies of June, 1877, and March, 1878, to interest on certain unquestioned securities issued under act of 1873, and

under a subsequent act of the legislature.   Upon an application for *mandamus* to the state treasurer to compel payment according to the directions of the appropriation of December, 1878, *held*—

1.  That the appropriation by the act of December, 1878, of the moneys in the treasury raised under the supply acts of 1877, and March, 1878, affected no fund derived under the act of 1873, and violated no contract of the state.

2.  That the appropriation of an unexpended balance in the treasury at the close of a fiscal year is not an act of borrowing, and is not repugnant to Section 3, Article IX., or to Sections 7 and 14, Article IX., of the state constitution.

3.  That this appropriation was not in violation of Section 4, Article IX., of the state constitution.   McIVER, A. J., *dissenting* as to the moneys derived from levy made under act of March, 1878.

What is the meaning of this section?

WILLARD, C. J., *holds,* that the *object* of a tax is sufficiently indicated by the general title of the act levying it, and when there is no law creating or sanctioning the subject matter of an appropriation, or it is no longer attainable, the moneys derived under such act may be appropriated to other objects under the same general head, if no legislative contract be thereby violated.   Distinction drawn between this case and *Martin* v. *Comptroller-General,* 4 *S. C.* 430.

HASKELL, A. J., concurs with Willard, C. J., and *holds further,* that the *object* of an appropriation under an act to defray the ordinary expenses of the government is accomplished by the close of the fiscal year, and all moneys then in the treasury under such act become an unexpended balance, requiring further appropriation by the legislature.

McIVER, A. J., *holds,* that the *object* of a tax levy is the specific purpose to which the money so to be raised is applied by the act directing the levy, and that this money cannot be thereafter diverted, until such object has been accomplished, or has become impossible of attainment.

———

This was an original proceeding in this court, praying a writ of *mandamus,* commanding the state treasurer, in accordance with the provisions of the appropriation act of December, 1878, to pay to the relator interest maturing in 1879 on certain bonds, reported to the legislature in February, 1878, by the bond commission to be valid obligations of the state, and specified in *Schedule* 5 of their report; and also to pay interest on certain bonds and stock issued under the act of March 22d, 1878, and designated as Deficiency Bonds and Stocks.

The application was resisted in behalf of certain bond creditors whose securities were specified in *Schedule* 6 of the report of the bond commission, and were undergoing investigation under the

proceedings instituted in the Special Court of Claims organized. under joint resolution of March 22d, 1878.

The grounds of resistance sufficiently appear in the arguments submitted in opposition to the application for the writ.

*Mr. A. G. Magrath,* for relator.

The money in the treasury out of which the relator asks payment was not raised under the funding act of 1873, nor by a specific levy, but by a levy for a gross amount of taxes under acts of 1877 and 1878. These acts are not *in pari materia* with the funding act. This money was intended to pay interest on the unrecognized debt, *when* recognized; under act of December, 1878, it is appropriated to pay interest on the recognized debt. The original disposition of this fund created no contract, express or implied. It was kept by the state in the hands of its own agent, and its power of disposition was uncontrolled.

The legislature never intended to regard the scheme of the funding act. And there can be no presumption of the surrender by the state of the powers which belong to it. An irrevocable disposition by the state of this fund would be equivalent to a transfer and assignment. Cases upon this point will be found collected in 3 *Lead. Cas. in Eq.* 363. None of the tests there given would establish the intention of the state here to part with the power to control. That control has been exercised in act of December, 1878.

An act will be declared unconstitutional by the courts, only when it is clearly so. See 6 *Cr.* 87 ; 4 *Wheat.* 625 ; 66 *Penna. St.* 164 ; 15 *Rich.* 66 ; 2 *Bail.* 673. This act is said to violate the constitution of the United States. What contract is violated ? The state has not recognized the obligation of bonds in *Schedule* 6 of the report of the bond commission—only those in *Schedule* 5. The direction to her agent to pay interest on a bond is not a contract with the holder of the bond, which would prevent the state from directing a different disposition by her agent of her own money. It is said that it disturbs the scheme of the funding act; this the state does not acknowledge. And the opponents of this motion have abandoned all rights under the funding

act by their voluntary submission to the investigation ordered by the state.

Nor does it violate Article IX., Section 4, of our constitution. By reference to the tax act and appropriation act of March, 1878, it will be observed that revenue is to be raised only for the one fiscal year, and is to defray the annual ordinary expenditures. The operation of a supply act expires with the year. 15 *Rich.* 138. This is in accordance with the mode and practice which has prevailed in Great Britain. *Hall Const. Hist.;* 1 *May Const. Hist.* 478. And we have it incorporated in this section of our constitution. It was not intended to be a check upon the legislature, but to secure obedience by the agent to the directions of the legislature. To maintain that money once appropriated to any object could, under no circumstances, be disposed of by a future legislature, would lead to irrational results, and impose upon the legislature limitations at variance with the constitution and at war with the welfare of the people.

*Mr. Samuel Lord, Jr.,* contra.

1. Sections 3, 7 and 9 of the funding act entered into and formed a material part of the contract made by the state with the holders of bonds issued under its direction and authority, and that by this contract the state obligated itself, first, to levy an *annual* tax of two mills upon the dollar upon the entire taxable property of the state; second, to keep the fund so created separate and apart from all other funds; third, to apply it to the payment of the annually-accruing interest upon the bonds and stocks issued under the act; and, fourth, to apply any surplus remaining in the treasury, after the payment of interest, to the purchase of the bonds issued under the act, in accordance with the provisions of the ninth section.

That these sections of the act are a part of the contract of the state with the bondholders, is settled by the following cases: 4 *S. C.* 430; 8 *S. C.* 71; 2 *Otto* 531.

This money, then, having been levied under a contract between the bondholders and the state, which required it to be appropriated to a certain purpose, to wit, to the payment of the coupons which matured respectively during the year for which the taxes

were levied, and the legislature having, in pursuance of the contract, appropriated it to that purpose, the attempt made by the act of December, 1878, to divert the fund to an entirely different purpose, is a violation of the contract made with the bondholder, and repugnant to Article I., Section 10, of the constitution of the United States.

Instead, therefore, of ordering the treasurer to obey the act of December, 1878, it would clearly be the duty of this court to impound this fund to prevent its diversion, and to see that it is kept separate and apart for the purposes specified in the act of 1873, and to which it was appropriated by the acts of June, 1877, and March 1878.

It is true that the legislature has annexed to this appropriation a condition, but we submit that this condition is one not warranted by the terms of the contract embodied in the act of 1873, and that so much of the act of 1878 as imposes it is unconstitutional and void.

We do not, of course, deny the right of the state to question the validity of any bond, but we do deny its right to require the holder to establish his claim in a· special court, of limited jurisdiction, authorized to try only "test cases," and to which he can only have access through the "consent of the attorney-general and his associates." A law which imposes terms like these violates the obligation of the contract under the guise of regulating the *remedy*. 8 *Rich.* 81 ; 6 *Otto* 448.

It is at least clear that until the disputed bonds have been declared invalid by a competent court, the state cannot determine that question in her own favor, and dispose of that portion of the fund which has been set apart for the payment of the interest due upon them.

Even if all the disputed bonds be void, this contemplated diversion cannot be legally made, because the seventh section of the act of 1873 requires the surplus of the tax remaining in the treasury, after payment of the interest, to be applied to the extinguishment of the debt. The object of this stipulation was to add to the worth and security of the bond, and it constitutes an essential part of the contract. The act of 1878 undertakes to appropriate, to a wholly different purpose, a fund specifically

appropriated for the payment of the bonds by the very act under which they were issued, and by Article IX., Section 4, of the constitution.

The necessary effect of the proposed appropriation will be to break up the whole scheme of the funding act and destroy all the benefits anticipated from it—benefits on which those who accepted its terms had a right to rely. It was the special object of that scheme, by providing extraordinary security and sanctions for the payment of the consolidated bonds, to induce the public creditors to reduce their claims fifty per cent. and exchange them for these new securities, and thus diminish the aggregate indebtedness of the state $10,000,000. This result would enhance the general credit of the state, and enable it to meet all its obligations and engagements with more certainty and less liability to failure. The creditors who surrendered their old bonds and took fifty per cent. of the amount in new bonds, in full satisfaction, did so on the faith that the scheme should be carried into effect as a whole. It cannot be supposed that they would have made the sacrifice they did without relying, as they had a right to do, on the whole scheme being rigidly carried out. The proposal to pay the coupons on the bonds of the petitioner, which shall mature in 1879, out of the taxes levied in 1877 and 1878, not only destroys the most essential features of the scheme, but makes an unjust discrimination between one class of creditors and another. 2 *Otto* 540.

2. The act of December, 1878, is simply a borrowing of this fund to defray the current expenses of the state, and is therefore in violation of Article IX., Section 3, of the constitution.

3. If the payment on the interest is not an ordinary expense of the state, then the forced loan made by the act of December, 1878, must be designed to defray an "extraordinary expenditure," and comes within the provisions of Sections 7 and 14 of Article IX. Upon all above points, see *Graham* v. *Horton*, 6 *Kan.* 343.

4. The diversion of the funds contemplated by the act is a palpable violation of Section 4, Article IX., of the constitution. The effect of this provision is to deprive the legislature of all power of misapplication by an authoritative and imperative ap-

propriation to the specific object set forth in the tax law as the ground of raising the specific tax.   4 *S. C.* 458.

5. *Mandamus* will not be granted if the interests of third parties are involved who are not before the court, even though it is averred that the claim of such parties is void.   *High on Man.,* § 39; 29 *Texas* 508.

*Mr. W. H. Brawley,* on same side.

April 6th, 1878.   The opinion of the court was delivered by WILLARD, C. J.   The relator asks a writ of *mandamus* to compel the state treasurer to pay from the treasury money appropriated to pay the class of claims to which those of the relator belong, by the nineteenth section of the act to make appropriations, approved December 24th, 1878.   16 *Stat.* 757.   The only question presented for consideration is the constitutionality of the act making such appropriation.   The various objections to this act will be noticed in the order presented in the points in behalf of the respondent.

The first objection is that it violates a legislative contract made with certain holders of bonds and stocks by an act entitled "An act to reduce the volume of the public debt, and to provide for the payment of the same," approved December 22d, 1873.   15 *Stat.* 518.

The object of this act was to consolidate the pre-existing bonded debt of the state, including outstanding state stocks, reduced to fifty cents on the dollar, and to re-issue the same in bonds of an uniform character, to be known as consolidation bonds and in stocks.   A large number of bonds and stocks issued under this act are now outstanding, and it is alleged that the act of 1878 is unconstitutional in its operation on the rights of some of the parties holding these securities.   Section 3 of the act of 1873 is as follows : "That the bonds and certificates of stocks herein authorized to be issued shall have upon their face the words ' consolidation bonds,' ' certificates of stocks,' and shall also bear upon their face the declaration that the payment of the interest and the redemption of the principal, is secured by the levy of an annual tax of two (2) mills upon the dollar upon the

entire taxable property of the state, which declaration shall be considered a contract entered into between the state and every holder of said bonds and stocks."

In order to bring the appropriation act of 1878 into conflict with these provisions, it will be necessary to show that there were at the passage of that act funds derived from the source indicated in the section of the act of 1873 just recited; that by the operation of that section such funds are secured to certain objects by the terms of a legislative contract, and that the appropriation act of 1878 has assumed to divert them from that object.

It must be conceded that the appropriation to pay the relator's demand is an appropriation for an object inconsistent with that of the act of 1873, and that it assumes to make a disposition of certain funds in the treasury.

The question then remains whether these funds were placed through the operation of a previous legislative contract beyond the reach of such legislation.

The scheme of the act of 1873, as it regards the remedy afforded for the payment of interest, (the word interest being here intended to include that covered by both coupons and interest orders on stocks) appears to have been that the legislature should annually cause to be levied a tax of two mills on the dollar on all the taxable property of the state, to be exclusively devoted to the payment of such interest.

Accordingly, at the same session and upon the same day in which the act of 1873 became a law, the general assembly, in the annual supply bill for the fiscal year 1873–74 levied a tax of one mill " to pay the half-yearly interest upon the public debt of the state (adjusted at the present session,) due and payable on July 1st, 1874." Again a tax of two mills was levied in each of the years 1874–75, and 1875–6, for the specific purposes contemplated by the act of 1873. Subsequently to the last-mentioned fiscal year the specific levy for that purpose has not been made. If it had been made to appear that any moneys collected under either of the tax levies above mentioned remained in the treasury, and were subject to being affected by the provisions of the appropriation act of 1878, a question would have been presented whether such funds were not placed, under the operation of the

2 G

act of 1873, beyond the power of the general assembly to make any other disposition of them than that contemplated by the act of 1873. But that fact is not made to appear, and cannot be assumed.

We must assume that whatever funds are in the treasury of the class here involved were derived under the supplies ordered for the fiscal years 1876–77, and 1877–78. As we shall see hereafter, there are claims for the payment of interest for both of those fiscal years outstanding, and undergoing inquiry as to their validity. The question then presents itself, whether any portion of the moneys levied and collected under the tax act for the fiscal year 1876–77, are devoted to the payment of such unpaid interest of that year by the provisions of the third section of the act of 1873 already cited. The tax act of 1876–77 was passed June 9th, 1877. 16 *Stat.* 286. It levies a tax of seven mills on the dollar for the following purposes, to wit : To meet appropriations. First, to defray current expenses of the government for the fiscal year ending October 31st, 1877 ; second, to pay interest due on January 1st, 1877, and on July 1st, 1877, upon the consolidated bonds and certificates of stock which have been issued under the act to reduce the volume of the public debt and provide for the payment of the same, approved December 22d, 1873, which shall be found valid and *bona fide* by the commission to investigate the same, and be approved by the general assembly at the next regular session thereof ; and third, to pay such other indebtedness of the state as may be reported to be valid by the said commission, and to which it may be applied by the general assembly at its next regular session." The question then is, whether any of the moneys collected under this act are brought under the operation of the third section of the act of 1873, already recited, so that their disposition is to be governed by that section of the act of 1873 to such extent as to defeat any of the provisions of the immediate tax act, under which it was raised, inconsistent with that section of the act of 1873. This question cannot be determined by the result of an inquiry whether the legislature was bound by the act of 1873 to raise such a fund as that act called for ; for if it be conceded that such is the case, that could not change the character of the fund in the treasury raised for other

purposes, even though inconsistent therewith.   This case does
not involve the questions of the general duty of the legislature
under the act of 1873, but simply the character and destination
of a specific fund in the treasury, and that must be determined
by the law of its creation, not by an inquiry as to what that law
should have been, but what it is.   It will be found that the tax
act of 1876–77 contemplates different objects from those indi-
cated by the act of 1873, and provides no fund that can be dis-
posed of under the last-named act without violating the law
under which such fund was created.

The tax levy for 1876–77 is not such a tax contemplated by
the act of 1873.   That intended by the act of 1873 was a specific
tax of two mills on the dollar, for the payment of interest and
the redemption of the principal of the consolidated debt.   The
term consolidated debt is here intended to describe the class of
bonds and stocks with their coupons and interest orders issued
under the act of 1873.   Such a tax would produce a fund of an
ascertained amount, the whole of which, when realized, would be
devoted exclusively to the object just stated.   The tax act for
1876–77 levies a gross sum for all purposes, and sets apart no
ascertainable proportion of the sums collected for either of the
several objects for which it was passed.   First, the current ex-
penses of the government are provided for; next, it is to pay
only such interest on the consolidated debt as should accrue
during that fiscal year upon such of the consolidated bonds and
stocks as should be found "to be valid and *bona fide* by the com-
mission to investigate the same, and be approved by the general
assembly at the next regular session thereof;" and third, on a
class of obligations to which the relator's claims belong.

The provision for the payment of the interest on the consoli-
dated debt does not recognize the act of 1873 as the test of the
validity of the bonds and stocks issued under it, but contemplates
an investigation by the general assembly of the validity of the
issues made under that act by means of a commission, which was
created at that session for that purpose, and finally reserves to
itself, at its next regular session, the final determination as to
the validity or invalidity of such issues.   It is therefore clear
that the tax law of 1876–77 cannot be regarded as intended to

carry out the objects and intents of the third section of the act of 1873.

We will next consider whether any money collected under the tax act of 1877–78, (16 *Stat.* 549,) is controlled by the provisions of the third section of the act of 1873. This act levies a tax of four and a half mills on the dollar, "for the purpose of meeting appropriations to defray the current expenses of the government for the fiscal year commencing November 1st, 1877, and to meet such other indebtedness as have been or shall be provided for in the several acts enacted by the present session of the general assembly for the same." It is not claimed that any appropriation was made at this session professing to carry out the objects and provisions of the third section of the act of 1873.

It is therefore clear that the conclusion already stated in reference to the act of 1876–77, has a still stronger bearing on its application to the act of 1877–78, and we must finally conclude that the appropriation under which the relator claims does not affect any fund in the treasury, derived under the third section of the act of 1873, or secured to particular objects under that section, as it regards their legal destination. Such being the case, the appropriation of these funds to other objects than those designated by the third section of the act of 1873, by the appropriation of 1878, cannot be claimed to be repugnant to any constitutional right to such funds derived under the third section of the act of 1873.

The seventh and ninth sections of the act of 1873 have been pointed out as bearing on the constitutionality of the appropriation act of 1878. Section 7 relates exclusively to the disposition of a "surplus fund," for which provision is made in Section 6, and Section 9 relates to the application of that surplus fund, after payment of accruing interest to the purchase of consolidated bonds and stocks, by way of reducing the principal of such bonded debt. It is a sufficient answer to this objection that no such fund appears to exist, nor could it be created out of funds derived to the treasury under the acts of 1876–77 and 1877–78, without violating the provisions of those acts, as it regards the destination of the funds so ordered to be raised, as we have already seen. This

cannot be done through any operation of the act of 1873, as we have also seen.

The second point made is, that the provisions of the act of 1878 are, in effect, the borrowing of money to defray current expenses, in violation of Article IX., Section 3, of the constitution, which directs that the general assembly shall provide for an annual tax sufficient to defray the estimated expenses of the state for each year. The appropriation of money remaining in the treasury at the close of a fiscal year, unexpended for appropriations for that year, has not the slightest resemblance to an act of borrowing.

The foregoing also disposes of the third point involving the same idea, that the transaction in question is an act of borrowing.

The fourth point is, that the relator claims a direction of funds in violation of Article IX., Section, 4 of the constitution, which provides that no tax shall be levied, except in pursuance of a law, which shall distinctly state the object of the same, to which object such tax shall be applied.

Much embarrassment surrounds the construction of this section of the constitution, if regarded as standing alone, without the aid of other sections; but the difficulty in the main disappears when it is stated in its proper relation to other sections.

Two cases naturally arise under this section. First, that of the annual tax levy for the support of the government of the state; and, second, special taxes laid with a view to special objects. The object of the general tax levy is fixed by the third section of Article IX. That section provides that "the general assembly shall provide an annual tax sufficient to defray the estimated expenses of the state for each year." In the next paragraph that relates to raising taxes to pay the deficiency of a preceding year, the expenses of the state are termed "ordinary expenses of the state." Ordinary expenses include the current expenses of the government and debts to mature during the current fiscal year. This must be deemed to be what is meant by the "object," as that term is used in Article IX., Section 4, where the tax law is of the general nature prescribed in Section 3. The effect of this section of the constitution, in the case of an annual tax for ordinary expenses, is to confine the proceeds of

that tax to the exclusion of objects that cannot come under that general description; in other words, to prevent the taking away of funds raised for the support of the government from that object and applying them to special objects of a different class; the manifest object being to prevent the state government from being embarrassed by the improper use of the means necessary for its support.

The other case is, where the tax is special; that is, other than such as is called for as an annual tax by Section 3. It necessarily follows that the object of such tax will be special also. In that case the declared object of raising the tax must govern the application of the fund raised thereby.

It is very clear that what constitutes the object, in the sense of the constitution, is some legal occasion that calls for the expenditure of money. That is, some obligation, present or prospective, created by law. Clearly, the constitution did not intend that the money raised under a special tax should be applied towards the purpose stated in such tax law, independent of there being any law constituting an appropriation for its disbursement.

Suppose, for instance, that money is raised to erect a public building, and no act for the erection of such building was passed during the fiscal year for which it was raised; clearly there is no authority to be gathered from that provision of the constitution that could warrant the disbursement of such fund toward such purpose without such a law. This shows clearly that the object intended by the constitution is that which is created by some law; or, in other words, some obligation, present or prospective, created and sanctioned by law.

So, if an appropriation should be made of funds raised for a special object under a special tax to some purpose consistent with such object, and the legislature should repeal such appropriation, it could not for a moment be contended that such money could be disbursed after such repeal, in the face of Section 12, Article IX., of the constitution, that declares that " no money shall be drawn from the treasury but in pursuance of an appropriation made by law." When for any reason the legislature could not repeal such appropriation as when it was made through the operation of the constitution itself, of course the question here con-

sidered could not arise. Such a case was presented in *Martin* v. *Comptroller-General*, 4 *S. C.* 430. In that case it was held that it was the manifest intent of the constitution that the provisions of acts intended to borrow money should operate as legislative contracts, so that the authority for the levy of a tax to pay the interest on any such loan, which is required to be given in such acts, could not be taken away by any subsequent act of repeal. Consistently with that object of the constitution, and as a material means of rendering it effectual, independent of future legislation, it was held that Section 4 operated in that particular class of cases as a constitutional appropriation of the proceeds of such special tax. Where, however, the legislature retains its ordinary power over appropriations, not having assumed to bind itself by a legislative contract, there can be no doubt but that it can repeal the authority for the disbursement of public money, whether raised under general or special levy. And it is equally clear that when the object for which money was raised is no longer attainable, it is subject to all ordinary demands upon the treasury sanctioned by law. Such is the ordinary practical construction of the constitution, and it is the only one consistent with that flexibility of financial arrangements that can secure the practical ends of government. It will be found that the tax acts of 1876–77 and 1877–78, are each general annual taxes for the ordinary expenses of the state government, and as such the only effect of Section 4, Article IX., of the constitution, is to confirm the application of the funds raised thereunder to such purposes as properly fall within the description of " ordinary expenses of the government;" that is, to current expenses and debts maturing during the fiscal year.

The act of 1876–77 provides for the payment of the current expenses of the government and certain indebtedness matured or to mature. It is, therefore, clearly a general tax levy, and, as such, entirely subject to the control of the legislature, provided the purposes to which it is appropriated fall within the general class of " ordinary expenses." It is unnecessary to consider this act particularly, for the provisions made by it only apply to certain indebtedness that should be reported valid by the commission to investigate the public debt, and should be approved

by the general assembly, while none of the class of claims urged as the reason for withholding the *mandamus* were so reported or approved. The act of 1877–78 raises a gross sum of four and a half mills for all purposes, exclusive of the school tax, and its declared object is "for the purpose of meeting appropriations to defray the current expenses of the government for the fiscal year commencing November 1st, 1877, and to meet such other indebtedness as has been or shall be provided for in the several acts enacted by the present session of the general assembly providing for the same." The effect of this is the same as if the purpose had been declared "to meet appropriations for current expenses and debts." Obviously, such an act can only be regarded as a general annual tax levy for "ordinary expenses," and, as such, the legislature may control, at any time, the disposition of the funds raised under it; subject to the proviso already stated, namely, that such appropriation must be of the nature properly described as "ordinary expenses of the government."

It is unnecessary to consider the construction of Section 12 of the joint resolution providing a mode of ascertaining the debt of the state and liquidating and settling the same, approved March 22d, 1878, (16 *Stat.* 673,) under which arises the only possible claim on the money in the treasury that could be made in behalf of that class of claims that are urged in opposition to the *mandamus*, as the provisions of that section, so far as they conflict with the appropriation of 1878, under which the relator claims, are repealed by the appropriation act of 1878.

It is not necessary to consider the terms of the appropriation of 1878, for it is conceded in the argument that unless it is found to be unconstitutional it supports the relator's present claim. The act repealed all former laws inconsistent with it, and therefore, if the joint resolution of March 22d, 1878, contained anything to support the present claim in behalf of the respondent, it must necessarily conflict with the subsequent appropriation of December 24th, 1878, and thus stand repealed.

The foregoing leads to the conclusion that there is nothing in the fourth section of Article IX. of the constitution that impugns the validity of the appropriation under which the relator seeks the writ of *mandamus* in this case.

The fifth and last point has no application to this case under the view that has already been presented. The *mandamus* should issue in conformity with the prayer of the petition.

HASKELL, A. J. The court is of one opinion on all the points in this case except as regards the meaning and application of the following provision in the state constitution: "No tax shall be levied except in pursuance of a law which shall distinctly state the object of the same, to which object such tax shall be applied." It is thought by one member of the court that this provision is violated by Section 19 of the act December 24th, 1878. 16 *Stat.* 765. A majority of the court, however, is of a different opinion, and I concur with the conclusion stated in the opinion delivered by the Chief Justice, but think it proper that some of the reasons for such conclusion on the constitutional point should be given more in detail, especially when a member of the court has expressed his dissent and stated his reasons. The act of March 22d, 1878, page 549, (16 *Stat.*,) entitled "An act to raise supplies and make appropriation for the fiscal year commencing November 1st, 1877," makes in its first section the general state levy (that is the constitutional name, Section 5, Article X.,) for the fiscal year, and in obedience to the constitution declares the object for which such levy is made, to wit: "Levied for the purpose of meeting appropriations (1) to defray the current expenses of the government for the fiscal year commencing November 1st, 1877, and (2) to meet such other indebtedness as have been or shall be provided for in the several acts enacted by the present session of the general assembly providing for the same." By reference to the acts the general object is thus divided into respective parts by specific appropriations. On page 540, (*Stat.* 16,) is an act of the same date as the last, "to make appropriations to meet the ordinary expenses of the state government for the fiscal year commencing November 1st, 1877." This act omits a considerable portion of the "ordinary expenses" of the government, although it does provide for many of the current expenses, including the executive and judicial departments. On page 520, same volume of statutes, is "An act to make appropriations for the payment of the per diem and mileage of the members of the

general assembly, the salaries of the subordinate officers and employees thereof, interest on the public debt and for objects herein named." The act is of precisely the same character as that (page 540) entitled "An act to make appropriations to meet the 'ordinary expenses' of the government." It (the act, page 520,) makes appropriations to meet the expenses of the legislative branch of the government, the expenses of a Court of Claims, of a commission to codify the laws, of divers other matters, such as "deficiencies" during the preceding fiscal year, and finally, by Sections 11 and 12, sums are appropriated for the payment of interest on the public debt; by Section 11, $189,340.27, "if so much be necessary," and by Section 12, $338,214.57, "if so much be necessary." The first to be applied to interest on certain bonds and stocks contained in *Schedule* 5 of the commissioners' report, and the second to be applied to interest on bonds and stocks enumerated on *Schedule* 6 of the same report. Conditions are annexed : First, that these payments must be made out of specific funds therein designated ; second, that none of the money appropriated by Section 12, page 525, 16 *Stat.*, should be paid out of the treasury on presentation of said coupons and interest orders, " either for the last or present fiscal year, *until* the consolidation bonds and certificates of stock on which they have accrued shall be finally adjudicated as to the validity of the said bonds and stock in favor of said bonds and stock, *in the manner provided for by* a joint resolution passed at this session of the general assembly, entitled 'A joint resolution to provide a mode of *ascertaining* the debt of the state and of liquidating and settling the same.' and none other." There is likewise an appropriation act of the same year, page 547, to pay back salaries due to several persons who had been lately professors of the University of South Carolina, and for other purposes, among the latter of which was a provision of $500 to pay the per diem and mileage of such members of the bond commission as might be summoned to attend the Court of Claims. It is needless to pursue these acts further. Several have been cited to show that although they vary in title they are all in substance of the same character, and are in effect mere component parts of the general appropriation act for the fiscal year commencing November 1st, 1877, and in fact they are so

declared by the first section of the general act of levy and appropriation for the said fiscal year, (16 *Stat.* 549,) which has been above cited.   The acts are thus presented to the view to remove confusion and to enable us to examine them in what I shall endeavor to show to be the true light as mere appropriations to meet the "estimated expenses" of the current fiscal year, composed in part of the "ordinary expenses" for that year, and " deficiencies" or past claims due but still unpaid.

The facts are that all the money levied and appropriated to meet such expenses as are provided for by Section 12, page 525, was not drawn from the treasury during that fiscal year.   The reason why the money was not drawn is admitted.   The legal validity of the bonds and stock had not been established during the fiscal year in sufficient amount to consume the entire appropriation.   The legislature, at its regular session in December, 1878, by the nineteenth section of the act to make appropriations for the fiscal year commencing November 1st, 1878, (16 *Stat.* 757,) enacted that the unexpended balance of the money collected into the treasury for the payment of the interest on the public debt should be applied to the payment of interest " on bonds and certificates of stock mentioned in *Schedule* 5 of the report of the bond commission,   *   *   *   [and] on such of the bonds and certificates of stock mentioned in *Schedule* 6 of said report of said commission which have been found valid by the special court known as the Court of Claims,   *   *   *   and on such of the bonds and certificates of stock as have been issued during the past year under Sections 13 and 14 of the said joint resolution, approved March 22d, 1878," and to the payment of interest on certain other bonds and stock issued under an act approved March 22d, 1878.   The question is whether that nineteenth section of the act of December 24th, 1878, is in violation of Article IX., Section 4, of the state constitution.   The affirmative of that proposition is forcibly presented in the dissenting opinion delivered in this case, and as it is a question which of necessity is apt to arise at every session of the legislature, it is entitled to grave consideration.   The question, in plain language, is this : When in any fiscal year a tax is levied by the legislature and appropriated to a specific object, and that object has not, or

does not, acquire legal force at any time during the said fiscal year, but it is possible that it may acquire such legal force in the future, can the legislature, in the next fiscal year, apply the fund to another purpose, or is the money tied up in the treasury by Article IX., Section 4, of the constitution, until the original object has acquired active energy or has become impossible, and in the eye of the law ceased to exist? I think that puts it fairly and in a stronger light than it can stand in this case, for Section 12 appropriates $338,214.57. "*if so much be necessary*," and judgment was passed on some of the bonds during the fiscal year, and they, coming within the provisions, had the right to draw the interest; and it might well be argued that the appropriation had been drawn, and that the unexpended balance, not having been necessary, was an unappropriated sum lying over to the credit of the state. But I prefer taking the question in its strongest light, that the law may be ascertained. The term "legal force," as I used it above, does not refer to this abstract legal validity of the claim, but to its legal right, under the act, of levy and appropriation. For instance, every consolidated bond may be valid, but the legislature did not, either under the stipulations of the act of 1873 or the constitutional provisions of Article IX., Sections 7 and 14, levy and appropriate to pay interest on the bonds generally. The levy and the appropriation provide for interest only on such of the bonds as may be passed upon favorably under proceedings in a specific court. Then, and not until then, does the interest due on such bonds become an object possessed of legal force by virtue of said acts of levy and appropriation. That constitutes the " legal force " used in the statement of the proposition. There is a proposition in the joint resolution establishing the Court of Claims, (16 *Stat.* 669, § 12,) " That the coupons and interest orders on any of the several classes of consolidation bonds or certificates of stock mentioned in the said *Schedule* 6 shall be paid out of the proceeds of the taxes for the last and the current fiscal years, respectively, *whenever* there shall be a final adjudication as to the validity of the said several classes of bonds and certificates, in the manner here provided, and none other." That section does not constitute a contract. Whatever may be its weight as a declaration or

pledge when considered by the legislature in its own proceedings, the judiciary has nothing to do with that. No obligation of contract would be impaired by its repeal, and it has been repealed by the act of December 24th, 1878, Section 20, page 765. That section, therefore, does not, in any respect, come before this court in the discussion of the present questions.

With these explanations I will proceed. The system of collection and expenditure of money for public purposes is very fully provided for in Article IX. of the state constitution. The rules therein prescribe the methods. One is to raise money for the "ordinary expenses of the state," and the other for "extraordinary expenditures." The first is by "annual tax," Article IX., Section 3; the second is by loan on state bonds, Article IX., Sections 7 and 14. The latter does not come within the discussion. Under the former, or the "ordinary expenses," are included all expenditures not provided for by money borrowed under Article IX., Sections 7 and 14. When bonds have been issued to raise money to meet an "extraordinary expenditure," they become a standing liability of the state, and the interest, as it falls due, becomes an "ordinary expense," to be included among the "estimated expenses" to make up the amount to be levied annually and appropriated annually. The only difference between the interest on such bonds and any other annual expense is that the interest is made, by the constitution, an obligatory expense, while many other expenses may be at the option of the legislature—as, for instance, the expense of the Court of Claims, the bond commission, and many other matters to which the constitution does not refer. The constitution, in its provisions on finance and taxation, appears to have two objects conspicuously in view. The first, that the state shall pay annually all the expenses of each year, and thus prevent accumulation of debt. The second is, that if "extraordinary expenditure" is deemed necessary, and the annual tax would be excessive, money shall not be raised except by bonds secured by certain laws prescribed by the constitution. To impose no more than the people were able and willing to pay each year, and to preserve the credit, were leading objects. Article IX., Section 3, undertakes to accomplish the first by ordaining that "the general assembly *shall* provide for

an *annual* tax sufficient to defray the *estimated* expenses of the state for *each* year; and whenever it shall happen that *such ordinary expenses* of the state for any year shall exceed the income of the state for such year, the general assembly shall provide for levying a tax for the ensuing year sufficient, *with other sources of income,* to pay the deficiency of the preceding year, together with the estimated expenses of the ensuing year." The direction is plain, positive and mandatory to pay as they went, each year. The tax levy is annual, the appropriation is annual, and the winding up of accounts in the treasury is of necessity annual; for otherwise the deficiencies of the last and the need of the present fiscal year could not be ascertained. Section 4 is the natural sequence of Section 3 : the " estimate of expenses " would be little more than a vain form if it were not to be based upon definite objects. Taxation for indefinite purposes would unavoidably lead to a squandering of the public money, and the people are entitled to information on such points. The positive law that the taxes shall be applied to the objects for which they are collected, and the law that the tax shall not be laid until the object has been defined, alike enable the people to know of and to prevent the repetition of unreasonable expenditures, and tend to preserve the credit of the state year by year. Such law further prevents the gross injustice of preference in appropriation after the levy has been made, as the law which inhibits the drawing of any money from the treasury except in pursuance of appropriation made by law, (Article IX., Section 12,) prevents such abuse on the part of the executive in the disbursement of the public funds. But the whole tenor of this article of the constitution leads to the conclusion that all these provisions apply to the *annual* transactions. The tax is levied for the expenses of the current fiscal year. The objects to which the tax *must* be applied are the items contained in those estimated expenses. Expenses include the payment of recognized indebtedness, as well as any outlay that the legislature may deem proper to make during that year. It is a very grave question whether the legislature has the right to levy any money which it does not intend to devote to an object during the current fiscal year. That question, however, does not now arise. But, on the other hand, the presumption is that the

legislature does intend to apply the money to an object which exists or may exist during the current fiscal year. Such appears to be the scope of the fourth section, and the proper rule of construction is, that the whole annual provision is confined within the limits of the fiscal year, and that if the appropriation can, by its words or the context, be made applicable during the fiscal year, the act must be confined to that year, and must be regarded as having expired at its termination. With regard to the act in question, it was entirely possible for the Court of Claims to have heard the cases and decided upon all the bonds and stocks within the fiscal year. As if, for example, the court had convened in May, as the act directed, and proceedings had been at once commenced, and on inspection the case had been so plain either way that the court would have rendered judgment immediately, as it did with regard to some of the bonds, and no appeal being taken, the matter would have been ended. If such had been the result, there could be no question. What has been the result is wholly immaterial in construing the law. What *could* have been the result is the point. It is unquestionable that the legislature could levy and appropriate for the fiscal year; it is questionable whether they could levy in one year and bind over indefinitely for the future.

In this case the levy was made, the condition was executed in part, and it was not impossible that it may have been executed as to the whole, within the fiscal year. There are no words in the act directly or indirectly extending the operation of the act beyond the fiscal year. The court is obliged to presume that the act meant what in law it ought to mean, there being no words to the contrary. The operation of the act being thus confined to the fiscal year, the "object" has been accomplished. So much of the money as "may be necessary" has been or is ready to be applied to such interest demands as were settled by the adjudication of the said court of claims within the fiscal year, and the rest is an unexpended balance which reverted at the expiration of the fiscal year to furnish, with the levy and money derived from other sources of income, the fund to meet the ordinary expenses of the ensuing year, including deficiencies coming over from the last. Such is the practice, and such we think is the

law made by the constitution. For instance, take the appropriation made by the fourteenth section of the same act of March 22d, 1878, page 526, "that the sum of $7500, if so much be necessary, be, and the same is hereby, appropriated to pay the salaries, clerk hire, and the expenses of the commission elected at this session of the general assembly to codify the laws, etc." Suppose, as I believe was the case, that no commission was elected at that session. The object of the levy and of the appropriation was plainly stated, and the money could not be applied during that fiscal year to any other purpose, but was held by the state treasurer under the appropriation caption in his books. It there remained until the end of the fiscal year. The object certainly was legal; indeed it is one directed by the constitution itself— Article V., Section 3. But it is hard to conceive that the money thus appropriated must be in the treasury until in some subsequent year provision may be made to revise and codify the laws, and then the money be applied. I see no real difference between that instance and the one now in hand. A construction of the constitution which would permit the legislative body at one session to levy and appropriate and extend the appropriation over subsequent years, and which would deprive the legislative body of the power to repeal such act at its subsequent sessions, and of power to use the money for any other purpose, would be sanctioned only by the plainest and most positive mandate. None such is found in the instrument itself. Such a provision would hedge in the legislature in such manner, that the representatives at a preceding session could deprive their successors of one of the most important of their powers. This would cripple the government and destroy the remedial effect of recurrent elections; for what would the relief be if the preceding body could have levied and appropriated in advance? The money would lie idle or the legislators would be obliged to carry out some design preconceived, and which perhaps their own judgment could not sanction. That would be compulsory legislation, which is contrary to the spirit of the government. The proposition is so serious in its nature and might lead to such abuse that, however virtuous the intention may be in any particular case, the principle could not be tolerated unless shown to be an unavoidable man-

date emanating from the sovereign power. But, as already said, both the spirit and the words of the constitution appear to be to the contrary. The system therein prescribed is one of annual collection and disbursement, and is mandatory. The legislature, it is true, is not forbidden to do otherwise, and the power of the legislature is plenary in its nature. Direct prohibition, however, is rare in constitutional provisions. "But the affirmative prescriptions and the general arrangements of the constitution are far more fruitful of restraints upon the legislature. Every positive direction contains an implication against everything contrary to it, or which would frustrate or disappoint the purpose of that provision." Cited in *Potter's Dwarris on Stat.* 64, *Denio, C. J.* A construction of Article IX., Section 4, which would permit appropriations extending beyond the fiscal periods to bind the legislature, would frustrate the main design of annually periodical settlements of the past, and provision for the present fiscal year, which is plainly expressed in Article IX., Section 3, of the constitution, and permeates the whole financial scheme. It would also seriously affect the character of the government itself.

I concur in the opinion delivered by the Chief Justice.

McIVER, A. J. As I am unable to concur entirely in the conclusion which has been reached by a majority of the court, it is perhaps proper that I should state very briefly the reasons for my position, without elaborating the argument in support of such position. As the funds out of which the relator is seeking payment cannot be regarded as derived from taxes levied by virtue of any of the provisions of the act of December 22d, 1873, (15 *Stat.* 518,) it is unnecessary to consider the effect of the provisions of that act. On the contrary, it must be conceded that the funds out of which the legislature has, by the nineteenth section of the act of December 24th, 1878, (16 *Stat.* 765,) undertaken to provide for the payment of the claims of the relator and others standing in like position, were derived from taxes levied by virtue of the act of June 9th, 1877, (16 *Stat.* 286,) and the act of March 22d, 1878. (16 *Stat.* 549.) According to my view the real question in the case is whether the nineteenth section of the act of December 24th, 1878, is in conflict with Section 4 of Article

2 H

IX., of the constitution of this state. That section of the constitution reads as follows: "No tax shall be levied except in pursuance of a law which shall distinctly state the object of the same; to which object the tax shall be applied." It follows, therefore, from this express mandate of the constitution that when a tax has been levied for a particular purpose or "object," that it is beyond the competency of the legislature to divert such tax from the purpose or "object" to which it has thus been appropriated by the constitution, until such object has been accomplished or becomes impossible of attainment. For it will be observed that the section of the constitution above quoted does not contain any negative words prohibiting the legislature from appropriating the taxes to any other purpose or "object" than that for which they were levied, but only an affirmative command that they shall be applied to such "object." Hence, when the "object" is accomplished or becomes impossible, the force of mandatory terms of the constitution is exhausted, and there is then no reason why the general assembly, which is invested with all legislative power not prohibited by the constitution, may not, by legislative act, direct the disposition of funds upon which the constitution no longer acts. The practical question therefore in this case is whether the funds out of which the relator claims payment were derived from taxes levied for some other purposes or "object," and if so, whether such purpose has been accomplished or has become impossible of attainment. What, then, was the object for which the taxes raised by the act of June 9th, 1877, and the act of March 22d, 1878, were levied? The act of June 9th, 1877, in its first section declares the object of that levy to be: "1. To defray the current expenses of the government for the fiscal year ending October 31st, 1877. 2. To pay the interest due January 1st, 1877, and July 1st, 1877, upon the consolidated bonds and certificates of stock which have been issued under the act to reduce the volume of the public debt and provide for the payment of the same, approved December 22d, 1873, which shall be found to be valid and *bona fide* by the commission to investigate the same, and be approved by the general assembly at the next regular session thereof, and third, to pay such other indebtedness of the state as may be reported to be valid by the said commis-

sion, and to which it may be applied by the general assembly at its next regular session." It will thus be seen that the taxes levied by this act were for three distinct objects. 1. Current expenses. 2. Interest due January and July 1st, 1877, on such of the consolidated bonds and certificates of stock *as should be found valid and bona fide by the commission to investigate the same* and be *approved by the general assembly at its next session.* 3. Such *other* indebtedness—by which I understand indebtedness *other* than consolidated bonds and stocks, *e. g.*, floating debt, which, by the ninth section of the joint resolution raising the bond commission, (16 *Stat.* 320,) said commission were required to investigate and report upon—as may be reported valid by said commission. But as that commission, commonly called the bond commission, made no report upon any indebtedness of the state, other than that represented by the consolidated bonds and stocks, the objects for which these taxes were levied were practically the first two current expenses and interest on *certain* of the consolidated bonds and stocks. For it will be observed that the object of the levy was, not to pay interest on the consolidated bonds and stocks *generally*, but only upon those which should be reported valid by the bond commission and be approved by the general assembly at its next session. If, therefore, it be true, as is understood to be admitted, that these two objects have been accomplished—that is, if the current expenses of the government for the fiscal year ending October 31st, 1877, and the interest due January 1st and July 1st, 1877, upon such of the consolidated bonds and certificates of stock as have been reported valid, by the bond commission and approved by the general assembly have been paid, leaving a balance of such taxes in the treasury— I see no reason why the general assembly could not appropriate such balance to any other purpose it saw fit. The fact that these taxes were appropriated by the legislature, by Section 12 of the act of March 22d, 1878, (16 *Stat.* 525,) to the payment of the interest on the consolidation bonds and stocks mentioned in *Schedule* 6 of the report of the bond commission, cannot affect this question, because that was not an appropriation made by the constitution, but only made by an act of the legislature, and therefore subject to alteration or repeal by a subsequent legisla-

ture.   Nor am I able to perceive how this act of March 20th, 1878, can be regarded as having the force and effect of a legislative contract, binding upon subsequent legislatures any more than any other appropriation act.   It is not so declared, and there is nothing in its terms which demands that it should be so construed.

Next, as to the object of the levy made by virtue of the act of March 22d, 1878.   16 *Stat.* 549.   In the first section of that act the object is declared to be " for the purpose of meeting appropriations to defray current expenses of the government for the fiscal year commencing November 1st, 1877, and to meet such other indebtedness as have been or should be provided for in the several acts enacted by the present session of the general assembly providing for the same."   These general terms render it necessary for us to examine " the several acts enacted by the present session of the general assembly," providing for indebtedness other than current expenses, in order to determine, definitely, what were the objects of such levy.   This examination shows that one portion of such indebtedness, which was provided for in the appropriation act passed at that session of the general assembly Section 12 of the act of March 22d, 1878, (16 *Stat.* 525,) was the interest due on January 1st and July 1st, 1878, " on the consolidation bonds and certificates of stock mentioned in *Schedule* 6 of the report of the commission," commonly called the bond commission.   One of the objects, therefore, for which the taxes raised by the act of March 22d, 1878, were levied, was for the purpose of paying the interest due January 1st and July 1st, 1878, on the consolidation bonds and stocks mentioned in *Schedule* 6 of the report of the bond commission, and until that object has been accomplished or until it becomes impossible of attainment, the legislature has no power, under the constitution, to divert such taxes from such object and apply them to other purposes.   It is very obvious that such object has not yet been accomplished, because by the same act it is provided " that no money appropriated by this section shall be paid on the said coupons or interest or any part thereof, either for the last or present fiscal year, until the consolidation bonds and certificates of stock on which they have accrued shall be finally adjudicated "

to be good and valid obligations of the state; and it is conceded that no such final adjudication has been had as to a large amount of such bonds and stocks, but that, on the contrary, questions relating thereto are now pending in this court. Until these questions are " finally adjudicated," it is impossible to say whether such object has become impossible of attainment.

It seems to be, therefore, that the funds now in the treasury arising from taxes levied by virtue of the act of March 22d, 1878, are, *by the constitution,* appropriated to the payment of the interest due January 1st and July 1st, 1878, on the consolidation bonds and stocks mentioned in *Schedule* 6 of the report of the bond commission, and that until that object is accomplished by the payment of such interest, or until it becomes impossible of attainment, by reason of a final adjudication against the validity of such bonds and stocks, the legislature has no power to appropriate such taxes to any other purpose.

My conclusion, therefore, is that the relator is entitled to a *mandamus* directing the state treasurer to apply the funds in the treasury, arising from the taxes levied by virtue of the act of June 9th, 1877, to the payment of the interest on his bonds falling due January 1st, 1879, but that he is not entitled to a *mandamus* requiring the state treasurer to apply the funds in the treasury arising from the taxes levied by virtue of the act of March 22d, 1878, to the payment of such interest; but that such taxes must remain in the treasury to meet the " objects " to which they have been appropriated *by the constitution,* until such objects have been accomplished or it becomes impossible to accomplish them.

*Mandamus* ordered.